UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,        )
                         )
         Plaintiff,      )
                         ) Case No.
        vs.           ) 18-3084-01-CR-S-MDH
                         )
                         )
CLINTON MCDONALD,            )
                         )
         Defendant.      )




SENTENCING
BEFORE THE HONORABLE M. DOUGLAS HARPOOL
MONDAY, MAY 21, 2019; 9:32 A.M.
SPRINGFIELD, MISSOURI




APPEARANCES:

FOR THE PLAINTIFF:        MS. JOSEPHINE L. STOCKARD
                         UNITED STATES ATTORNEY'S OFFICE
                         901 St. Louis, Ste. 500
                         Springfield, MO 65806

FOR THE DEFENDANT:        MR. STUART P. HUFFMAN
                         WHITEAKER & WILSON
                         3315 E. Ridgeview
                         Springfield, MO 65804

COURT REPORTER:           MS. JEANNINE RANKIN, RPR, CSR
                         UNITED STATES DISTRICT COURT
                         222 N. Hammons Parkway
                         Springfield, MO 65806



Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1                USA v. CLINTON MCDONALD

 2              CASE NO. 18-3084-01-CR-S-MDH

 3                        SENTENCING

 4                       May 21, 2019

 5                    *   *   *   *   *   *

 6         THE COURT:  We are here in United States versus

 7   Clinton McDonald for sentencing.  Who appears on behalf of the

 8   United States?

 9              MS. STOCKARD:  Jody Stockard for the United States.

10              THE COURT:  On behalf of the defendant?

11              MR. HUFFMAN:  Stuart Huffman on behalf of the

12   defendant, Clinton McDonald.

13              THE COURT:  Mr. McDonald, would you stand.

14              My name is Doug Harpool.  I'm the federal district

15   judge that has the duty this morning to sentence you for the

16   crime you committed.  The law requires me to sentence you to a

17   sentence which is sufficient but not greater than necessary to

18   meet the objectives of the U.S. sentencing laws.

19              We'll start this hearing with the lawyers and I

20   discussing as to what sentence the law authorizes for the

21   crimes you've committed; basically, that's what law did the

22   Congress pass, what did they say the sentence could be.  Then

23   we'll focus on what the sentence should be, and in doing so

24   we'll consider each of the factors that the law allows me to

25   consider.  Even if I don't specifically mention one, I'll
```

2

1    consider them all in my decision.

2            But the first one we'll talk about and the lawyers

3    and I will spend some time on are the U.S. Sentencing

4    Guidelines.  That's this book here.  The U.S. Supreme Court

5    says that in every sentencing a district judge like myself has

6    to calculate what your sentence would be if we followed the

7    guidelines in that book that are promulgated by the U.S.

8    Sentencing Commission.  So that's the next thing we'll do

9    after talking about the authorized punishment, we'll calculate

10   that guideline.

11           But then we'll hear argument on the other factors

12   too that are relevant to sentencing.  There are many of them.

13   They're in Title 18, Section 3553(a).  We will get

14   recommendations from each of the counsel as to what the

15   sentence should be.

16           When they're finished making their arguments and

17   presentations, you'll have an opportunity to say something to

18   me, if you want to.  You're not required to say anything, but

19   if you want to say something, then certainly I want to hear

20   it.  When that's done, I make a final decision.  I'll tell you

21   what it is and I'll tell you how I came to that conclusion the

22   best that I can.

23           Before I have entered the courtroom I've read

24   everything that's been submitted to me, so I'm familiar with

25   your case, familiar with the crimes you committed and your

3

1  background, but I haven't made any final decision, and I won't
2  until we've completed each of the steps that we've talked
3  about.
4          So you understand how we're going to proceed?
5          THE DEFENDANT:  Yes, sir.
6          THE COURT:  Now, have you read your presentence
7  investigation report?
8          THE DEFENDANT:  Yes.
9          THE COURT:  Had a chance to talk to your lawyer
10 about it?
11         THE DEFENDANT:  Yes.
12         THE COURT:  All right.  Go ahead and be seated,
13 then, and we'll get started.
14         Counsel, the defendant is here to be sentenced for
15 three crimes.  The first, Count 1, distribution of a mixture
16 or substance containing a detectible amount of morphine and
17 codeine, the second is Count 2, possession with intent to
18 distribute a mixture or substance containing a detectible
19 amount of heroin, and, three, being a felon in possession of a
20 firearm.
21         The authorized punishment for those crimes, as I
22 understand it, are Count 1 would be a sentence of not more
23 than 20 years, a fine of not more than $1 million, supervised
24 release of not less than three years which could extend to
25 life.  On Count 2 the authorized punishment is the sentence --

1   is the same punishment as what I just described for Count 1.

2   Then for Count 3 the punishment would be not more than ten

3   years in prison, not more than a $250,000 fine, not more than

4   three years of supervised release.  Of course, with regard to

5   each of the felony counts you would also be required to pay

6   the $100 mandatory special assessment.

7          Any disagreement with the Court concerning the

8   authorized punishment for the crimes that this defendant is to

9   be sentenced for?

10         MS. STOCKARD:  No, Your Honor.

11         MR. HUFFMAN:  No, Your Honor.

12         THE COURT:  So that's what we know that the legal

13  sentence would be for this defendant for each of those crimes.

14         Let's now focus on what the appropriate sentence for

15  this defendant for those crimes would be.  We will start with

16  reference to the U.S. Sentencing Guidelines, as I previously

17  indicated.  The U.S. Sentencing Guideline requires us to set

18  both an offense level and a criminal history category.  For

19  this defendant the criminal history category as calculated in

20  the presentence investigation report is six.

21         Are there any objections we need to take up or

22  consider regarding that issue?

23         MS. STOCKARD:  Not from the government.

24         MR. HUFFMAN:  Judge, I think my objections were made

25  more to not criminal history but --

```
 1              THE COURT:  To the offense level, I think.

 2              MR. HUFFMAN:  -- to the offense level, yes, sir.  So

 3    there's no objection to the criminal history.

 4              THE COURT:  That's what I thought.  I just wanted to

 5    make sure.

 6              So the Court does find that the defendant is

 7    criminal history six.

 8              Mr. McDonald, unfortunately, that's the highest

 9    criminal history category that the guidelines recognize.  And

10    the guideline sentences, as you might expect, get higher as

11    the criminal history gets higher.

12              Let's now talk about offense level.  The presentence

13    investigation report assigns an offense level of 29 to the

14    defendant.  That's out of a high of 43.  I notice that the

15    defendant does have multiple objections to the offense level.

16              Let's take those up and consider them at this time,

17    Mr. Huffman.

18              MR. HUFFMAN:  Thank you, Judge.

19              Judge, the initial objection that we made is page 7,

20    Paragraph 21.  Our objection was is that the base offense

21    should be a 20 and not a 22.

22              There was an enhancement as part of the PSI

23    investigation that the defendant possessed a semiautomatic

24    firearm capable of accepting a large capacity magazine.  In

25    the reports there was a weapon seized, a Palmetto brand, PA-15
```

model, 5.56 caliber semiautomatic rifle that was loaded. As
the Court is aware, there was a stipulation of facts in this
particular case. Of course, at that point Mr. McDonald did
not admit nor stipulate to possession or knowledge of that
particular firearm which is the subject for the enhancement.

We believe, Judge, when you look at the stipulation
of facts as to what Mr. McDonald admitted -- and I know the
government may have testimony, but there were multiple
individuals involved in the vehicle itself: Mr. McDonald, who
was the driver, Mr. Lynn, who was the passenger, and
Mr. Edwards, as well, who was another passenger. There was a
minimum of at least three individuals in the vehicle, which
any of the other individuals could have had possession of the
firearm. The firearm was not found on the person of
Mr. McDonald, nor was it shown to be in his actual possession.

The government I know has stated in their objections
that there was an item that was similar or would have fit that
particular rifle found in the vehicle in the trunk. Again,
multiple individuals had access to that particular vehicle and
there's no showing evidentiary-wise that Mr. McDonald was the
sole, exclusive individual in control and had possession and
eminent domain of that particular vehicle.

I know that there's some case law. I've also looked
at other case law with *Dooley* where we talk about possession
and presence alone is not enough. In fact, example in *United*

7

1   *States v. Dooley* was just if you give a ride to a police
2   officer doesn't mean you possess the firearm that he may have
3   on his hip.  That's referenced within *United States v. Dooley*,
4   an Eighth Circuit case.
5            We believe, Judge, in this particular case -- we
6   believe in this particular case, Judge, that there is not
7   sufficient evidence for purposes of sentencing to determine
8   that Mr. McDonald was in possession of the semiautomatic and
9   therefore the base offense on page 7, Paragraph 21 should be a
10  Level 20.  Then I may respond additionally after the
11  government's response.
12           THE COURT:  Is this the rifle that allegedly was
13  thrown out of the vehicle?
14           MR. HUFFMAN:  Yes, Your Honor.
15           THE COURT:  Okay.  And it was found loaded with
16  40 -- you're not denying that the weapon is a high capacity;
17  what you're saying is your client didn't possess it?
18           MR. HUFFMAN:  Correct, Your Honor.  I can't deny the
19  nature of the weapon itself.
20           THE COURT:  Okay.  Thank you.
21           Ms. Stockard.
22           MS. STOCKARD:  Your Honor, I do have four witnesses
23  and some photos and the video of the chase that I do want to
24  present to the Court.  It might be easier for me to do that as
25  a whole and then we kind of go back and evaluate each firearm.

THE COURT:  You think your witnesses would have

testimony that would be relevant not just to this objection

but to the other objections that have been lodged?

          MS. STOCKARD:  Yeah.  There's some details that

aren't present in the PSR.  It's not my intent to call them

and do full direct with people but just have them state where

they found the firearm.  And then I've got some pictures to

show the Court so you can kind of decide better what firearms

you think he possessed.

          THE COURT:  All right.

          Mr. Huffman, do you want to go ahead and mention

your other objections before we receive any evidence so that

all the issues can be in front of the Court before --

          MR. HUFFMAN:  That would be fine, Judge.  And

Ms. Stockard and I had just discussed that a little bit prior

to the hearing so I was fully aware that there would be

testimony covering multiple issues.

          The same kind of issue that we run into is -- I'll

stay consistent.  I'll come back a little bit.  There's a

two-level enhancement on page 7, paragraph 22 under

2K2.1(b)(1)(A).  That particular objection, it is a possession

of three to seven firearms.  Mr. McDonald, in his stipulation

and plea that was agreed upon with the government, admitted to

possessing the one firearm.  In this particular case, their

enhancement is for possession of three to seven firearms,

                                9

1   which I believe is consistent with the evidence that will

2   probably be presented by the government.  That's consistent

3   with our argument and our objection that Mr. McDonald was

4   responsible for only one firearm and therefore that two-level

5   enhancement should not be attached.

6          Our argument would be the same as far as actual

7   versus constructive possession, the case law that is around

8   that both for drugs and/or guns.  The fact that Mr. McDonald

9   was the driver of the vehicle doesn't mean that he possessed

10  either actually or constructively other firearms that were

11  found within the vehicle, thrown from the vehicle or found

12  along the path of the vehicle's path considering that there

13  were two other individuals present in the vehicle itself, one

14  of which the Court will hear testimony and exhibits was a

15  convicted felon at the time, the other who actually has

16  criminal history as well.  So both would have incentive to

17  discharge or to remove firearms from their person or presence

18  if they had it in order to avoid law enforcement under these

19  circumstances.

20         THE COURT:  Let me discuss with you a concept that

21  as I was reading this I was -- obviously the actual or

22  constructive possession is one issue, but isn't there also a

23  concept of joint possession?  So is it possible that even

24  though one of those individuals may also be found to have been

25  in possession of the firearms that your client could be found

1  in joint possession?

2        MR. HUFFMAN:  Your Honor, there's case law out

3  there —— I think *Dooley* addresses that as well where it talks

4  about intent and knowledge.  So I think you still have to show

5  or at least come to an understanding that Mr. McDonald would

6  have had knowledge that those guns were present and/or that

7  the other individuals may have had guns on his person.

8        THE COURT:  I guess I'm thinking of a situation

9  where if one of the guys had a gun in their waistband and it

10 was covered with a shirt, it's one issue, but if it was lying

11 in the floorboard of the vehicle, that might be a different

12 issue.

13       MR. HUFFMAN:  I can't disagree with that.  Our

14 position would be is that the way the accident —— I think

15 you'll hear testimony of this —— is that this was an

16 individual —— individuals were kind of thrown amongst the

17 vehicle itself and so there's really still no determination

18 that a gun may have been hidden or in some way hidden from

19 view from Mr. McDonald and then the accident takes place and

20 then a gun could potentially be thrown from one of the other

21 individuals or removed just in the nature of the crash itself.

22 Same as if Mr. McDonald is driving and he's focusing on

23 driving itself and a co-defendant, realizing that —— and I say

24 co-defendant but it's an individual —— they're not charged

25 but ——

1        THE COURT:  I was going to say, has anybody else in
2   the vehicle been charged?  You said one of them was a felon,
3   so he shouldn't be having a weapon either.
4        MS. STOCKARD:  No, no one else has been charged, not
5   federally.
6        MR. HUFFMAN:  So if he sees officers behind them,
7   recognizes that he himself has a gun on his person and just,
8   you know, throws it out the window, Mr. McDonald may not have
9   known that that weapon was present even as he's rolling down
10  the window.  Could have been something else being thrown out
11  the window.  So I recognize the Court's question on that but
12  we still believe that there still has to be shown a knowledge
13  and an intent to exercise.
14       Even as a joint venture, you have to show some sort
15  of joint effort or some sort of joint action.  Again, an
16  officer, if he gets in the car with him, I may know he has a
17  gun doesn't mean that I possess his gun.  Granted, we may have
18  different mechanisms or roles or what we're getting ready to
19  do, but just presence alone is not sufficient.
20       Again, with somebody else throwing a firearm out of
21  the back seat, for example, Mr. McDonald may not have any
22  knowledge or understanding of that.  So that's our position
23  with --
24       THE COURT:  So you talked to me about Paragraph 21
25  and 22.

```
 1              MR. HUFFMAN:  Yes, sir.

 2              Page 7, Paragraph 23 also deals with the firearms.

 3    We objected for the two-level enhancement under 2K2.1(b)(4)(A).

 4    That particular enhancement, a two-level enhancement was

 5    provided for possession of a Glock firearm, Serial No. SFK266,

 6    indicating that it was -- I'm sorry.  That was the one that he

 7    entered the plea to and possession of.  That gun was not

 8    itself considered stolen or confirmed stolen.  The other

 9    pistol, Serial No. BFGU451, had been confirmed stolen as part

10    of the investigation.

11              THE COURT:  That's the second weapon that was

12    allegedly thrown out the window?

13              MR. HUFFMAN:  Yes, I believe so.

14              THE COURT:  Okay.

15              MR. HUFFMAN:  In that particular scenario, again,

16    Mr. McDonald did not admit as part of his plea colloquy nor

17    during the investigation that he had any sort of knowledge

18    that any of the firearms that had been thrown out of the

19    vehicle were stolen, nor did he have knowledge that any of the

20    other individuals may have stolen those firearms, nor is there

21    evidence that Mr. McDonald was involved in the theft of those

22    firearms.

23              For that reason, Judge, we believe under page 7,

24    Paragraph 23 an objection is appropriate and the two-level

25    enhancement should not be applied.
```

13

```
 1          THE COURT:  All right.

 2          MR. HUFFMAN:  There is page 7, Paragraph 24.

 3  There's a four-level enhancement specifically under

 4  2K2.1(d)(6)(B).  In that particular case, Count 1,

 5  Mr. McDonald admitted to the distribution of a controlled

 6  substance; however, during that particular offense there's no

 7  evidence that he possessed a firearm.  That offense took place

 8  in 2016.

 9          In Count 2 he admitted to possession with intent to

10  distribute a controlled substance, but, again, in that

11  particular case there's no set of facts or evidence that he

12  possessed a firearm during the course of what would be

13  classified as a hand-to-hand transaction.  So that's a

14  situation where an officer came, dropped basically drugs in

15  his lap, transaction took place, no gun was seen, no gun was

16  mentioned, there was no observation of a gun.

17          In Count 3 he admitted to being a felon in

18  possession from a separate incident.  In that particular

19  incident -- and the PSI writer indicates that he had a gun in

20  connection with possession with intent to distribute.  While

21  there was a pill bottle that was found within with suspected

22  drugs, Mr. McDonald was not found guilty, pled guilty to any

23  incident.  The pill bottle was not, to my knowledge, shown to

24  be Mr. McDonald's.  There's no evidence that Mr. McDonald knew

25  that the pill bottle was in the vehicle or where it came from.
```

1   Furthermore, Mr. McDonald was not charged in that particular

2   incident with in furtherance of under 924(c).

3           So our position, Judge, is under the four-level

4   enhancement for -- as set forth in the PSI, that he did not

5   possess a firearm in possession or in furtherance of the

6   charge of possession with intent to distribute.  There was no

7   evidence of any sort of distribution at the time of the crash

8   or the incident involving the crash.  Again, a pill bottle

9   found with suspected codeine and suspected heroin but, again,

10  that pill bottle was not -- Mr. McDonald was not charged with

11  the contents of that pill bottle.  And, again, under the

12  actual versus constructive possession, at least two other

13  individuals in the vehicle.  That pill bottle could have come

14  from any one of those other individuals involved.  So I think,

15  again, it goes kind of that same grouping of issues related to

16  the --

17          THE COURT:  Basically you're arguing that, yes, he

18  got caught with weapons he shouldn't've had on one occasion --

19  on occasions and, yes, he got caught with narcotics on

20  different occasions, but at no time was he -- did he get

21  caught with both at the same time?

22          MR. HUFFMAN:  Correct.

23          THE COURT:  All right.

24          MR. HUFFMAN:  The last objection that we made,

25  Judge, which is a little bit independent of the others, and

```
1    I'm going back up to it, is the obstruction of justice.  On

2    the obstruction of justice, Judge, obviously our position

3    is -- as set forth in the objections that's been provided and

4    included in the final PSI -- he was given a enhancement for --

5               THE COURT:  That's for not yielding to the officers

6    and allegedly going on a high-speed chase?

7               MR. HUFFMAN:  Correct.

8               Our position would be is I recognize that the

9    high-speed chase in and of itself does create an inherent

10   risk; however, our position is is that -- it says, "Any person

11   including any person except a participant in the offense who

12   willingly participated in flight."

13              We would make an argument that these individuals

14   even under the state's own position -- or government's

15   position would argue that they're all together under a sole

16   purpose; however, our position is, Judge, as set forth in the

17   objection, I think at that point we don't believe an

18   obstruction of justice is there.

19              While there was a high-speed chase, the participants

20   involved, the only individuals affected by it were

21   participants within the vehicle itself.  Mr. McDonald and each

22   of the other two individuals involved were injured, to my

23   knowledge, although charges were never pressed against

24   Mr. McDonald for any sort of vehicular assault against either

25   of the other two passengers.
```

16

1          We believe, Judge, that a enhancement and/or -- I'm
2   sorry, the enhancement is inappropriate and we would argue
3   that it should not be granted for an obstruction of justice
4   and therefore the guidelines should be modified to reflect the
5   objections set forth in the final PSI.
6          THE COURT:  Let me -- I got a couple questions I
7   want to ask.
8          On the three to seven firearms, there were two found
9   in the car, correct?
10         MR. HUFFMAN:  Yes.
11         THE COURT:  And so if he was found in possession of
12  those two -- and I realize that's still to be determined --
13  then if he possessed either of the other two, then that would
14  be three and that would be enough to get that same
15  enhancement?
16         MR. HUFFMAN:  Yes, Your Honor.
17         THE COURT:  But if he doesn't -- he's found not to
18  be in possession of any two of the four, then the enhancement
19  doesn't apply?
20         MR. HUFFMAN:  Yes, Your Honor.
21         THE COURT:  And as to the stolen -- I was flipping
22  through pages up here.  When I read the enhancement, it says
23  if the firearm was stolen, increase by two levels.  Is there
24  case law about what knowledge the defendant -- was the
25  defendant have to know it was stolen?  I realize the

17

1  possession issue still exists but if he is found in possession
2  of that firearm is it required that he have -- know that it's
3  stolen or just that the fact is it was stolen?
4          MR. HUFFMAN:  The case law that I have found
5  indicates just that it was stolen, although our position has
6  always been that, again, knowledge and intent should be an
7  essential element of any enhancement under the sentencing
8  guidelines in lieu of case law out there as far as particular
9  enhancements, especially in light of cases that reflect the
10 right of confrontation, the right of due process.
11         So we do feel that Mr. McDonald, the fact that it
12 was stolen in and of itself, I think the case law supports an
13 enhancement just for that fact alone, but our position is
14 still that you should have to be able to show knowledge or
15 some sort of understanding or even a reasonable likelihood
16 that it would have been stolen.
17         THE COURT:  All right.  Then let me ask you about
18 the enhancement of 24 for connection with another felony
19 offense.
20         Your analysis deals with the felony offense of drug
21 sales and certainly the two first counts here, that's what
22 he's convicted of, but is fleeing a law enforcement officer in
23 a motor vehicle a felony in Missouri?  And if so, did he
24 possess the weapon in connection with that crime and therefore
25 I don't even need to reach the issue of whether he had it in

18

1   connection with the sale?

2          MR. HUFFMAN:  Obviously under 24, I know what the

3   probation officer set forth is that it was connection with

4   possession specifically with intent to distribute a controlled

5   substance.

6          To get to the second aspect and the question that

7   you've asked, resisting arrest in the state of Missouri can

8   either be a misdemeanor or felony offense depending on the

9   circumstances surrounding the actions.  Depending on the

10  alleged charge, the danger alleged, the nature of the

11  resisting physical force, those are all factors that would

12  lead to a prosecutor making a charging decision as to whether

13  it's a misdemeanor or whether it's a felony offense.

14         I would tell the Court that generally fleeing in and

15  of itself is not necessarily a felony.  You can run from an

16  officer and it be a misdemeanor unless you're fleeing for what

17  is determined to be a felony warrant or charge.  I think the

18  case law says charge.  It used to say warrant but now it's

19  clarified.

20         In this particular case, Judge, obviously he's not

21  been charged with resisting arrest or fleeing.  I know that's

22  not required as well under the case law, but I think at this

23  point that there is some argument that it could have been a

24  misdemeanor or felony offense.

25         THE COURT:  Remind me, wasn't there a warrant out

                                  19

1  for his arrest?

2          MR. HUFFMAN:  I believe that he was being

3  investigated or looked at as a potential witness in the

4  homicide investigation.  I am not aware of an active warrant.

5  I think the government would be in a better position to speak

6  to that.

7          THE COURT:  All right.  And I may be thinking of the

8  fact that he was being sought as a witness.  I just remember

9  the police were looking for him.

10          MR. HUFFMAN:  That is correct, they were looking for

11  him.  His brother had been shot and killed and there was some

12  questions that law enforcement were looking towards him for.

13  My understanding was is that he was no more than a witness and

14  somebody they were looking for for information but he himself

15  was not suspected in the homicide, although eventually he may

16  have been.

17          THE COURT:  I found the line in the presentence

18  investigation.  It actually says he was wanted on a probable

19  cause of hiding for unlawful use of a weapon related to a

20  homicide investigation.

21          MR. HUFFMAN:  Correct.

22          THE COURT:  So it's not an actual warrant, as such.

23          MR. HUFFMAN:  Yes, sir.

24          THE COURT:  Thank you.

25          Ms. Stockard, you want to be heard on any of the

20

1    legal issues I raised or you want to go ahead and present your

2    evidence?

3              MS. STOCKARD:  I'd like to present my evidence, Your

4    Honor, and then argue.

5              THE COURT:  Okay.  You may proceed.

6              MS. STOCKARD:  The government would call Josh McCain

7    with the Springfield Police Department.

8              THE COURT:  Come forward and raise your hand to be

9    sworn, please.

10   JOSH McCAIN, GOVERNMENT'S WITNESS, SWORN:

11             MS. STOCKARD:  Before I start, Mr. Huffman, do you

12   have a copy of the exhibits?

13             MR. HUFFMAN:  I do.

14             MS. STOCKARD:  Judge, do you have the packet with

15   the exhibits?

16             THE COURT:  I have a list.

17             Yes, I do.

18             MS. STOCKARD:  Are you okay with me approaching the

19   witness?

20             THE COURT:  You may, and you don't need to ask

21   permission, just do so professionally.

22             MS. STOCKARD:  Thank you.

23                          DIRECT EXAMINATION

24   BY MS. STOCKARD:

25   Q    Would you state your name for the record, please.

                              21

1   A    I'm Corporal Josh McCain.

2   Q    And what do you do for a living?

3   A    I'm a police corporal with the city of Springfield Police

4   Department.

5   Q    And I want to take you back to August 8th of 2018.  Were

6   you working for the Springfield Police Department on that day?

7   A    I was.

8   Q    Were you involved in a chase with a black BMW on that

9   date?

10  A    Yes, ma'am.

11  Q    What I first want to do, do you see a map in front of you

12  on the screen?

13  A    Yes.

14  Q    And were you patrolling in that area that day?

15  A    Yes.

16  Q    Based on your knowledge of Springfield, is that a fair

17  and accurate representation of that area?

18  A    Yes.

19       MS. STOCKARD:  Your Honor, I'd move to admit what's

20  been marked as Government's Exhibit No. 2.

21       MR. HUFFMAN:  No objection.

22       THE COURT:  Two will be admitted.

23  Q    (By Ms. Stockard) I kind of want to orient everybody on

24  where you were when the chase began and where you were when

25  it ended before we play the video.

```
 1   A    Okay.
 2   Q    If you click on the screen, it should give you an arrow.
 3   A    Okay.
 4   Q    Using the arrow, can you show us kind of where you were
 5   when the chase began?
 6            MS. STOCKARD:  Is the arrow showing up on anybody
 7   else's?
 8   A    I have a pencil that showed up.
 9            THE COURT:  I have it on mine.
10            MR. HUFFMAN:  I have a pencil on mine.
11            MS. STOCKARD:  Can everybody see the pencil?
12            MR. HUFFMAN:  There's an arrow.
13   Q    (By Ms. Stockard) So the arrow that you're pointing at,
14   if we're looking at Exhibit No. 2, you're pointing at -- is
15   that where you were when the chase began?
16   A    Yes, ma'am, at the Burger King located at the corner of
17   National and Cherry.
18   Q    Using the arrow, can you just kind of show the route that
19   you went on?
20   A    Yes, ma'am.  We went westbound on Cherry all the way to
21   Jefferson, right here.
22   Q    And that arrow is near St. Agnes's Cathedral.  Is that
23   where the chase ended?
24   A    Yes, ma'am.
25   Q    I want to show you what's been marked as Government's
```

23

```
 1   Exhibit No. 1.  Did you have a dash camera on your vehicle
 2   that day?
 3   A    Yes, ma'am.
 4   Q    Was it operational?
 5   A    Yes.
 6   Q    What I'm showing you, does that document the dash camera
 7   that was in your vehicle that day?
 8   A    Yes, ma'am.
 9   Q    Is that a fair and accurate representation of that chase
10   within the limitations of that camera?
11   A    Yes.
12        MS. STOCKARD:  Your Honor, I'd ask that Government's
13   Exhibit No. 1 be admitted into evidence.
14        MR. HUFFMAN:  No objection.
15        THE COURT:  One will be admitted.
16        (Government's Exhibit No. 1 playing.)
17   Q    (By Ms. Stockard) We've starred the video now.  Is this
18   going north on National?
19   A    South on National.
20   Q    The sound's not on here but on this display can you see
21   how fast you're going?
22   A    I probably missed the top speed but I know it was
23   somewhere around 70 miles an hour.
24   Q    And what's the speed limit in this area?
25   A    I believe it's about 35.
```

24

1   Q    And what time of day was this?

2   A    Three-forty in the afternoon.

3   Q    And as you were driving were there pedestrians and other

4   vehicles around?

5   A    Yes, ma'am.

6   Q    Is this the end of the chase here?

7   A    Yes.

8        MS. STOCKARD:  For the record, we're at 3:42:15.

9   Q    (By Ms. Stockard) I also want to hand you what's been

10  marked Government's Exhibits 3, 4 and 5.  Do you recognize

11  those?

12  A    Yes, ma'am.

13  Q    What are they?

14  A    They are photographs taken after the pursuit of the

15  vehicle and some items in the vehicle.

16  Q    Are they fair and accurate representations of those items

17  as you saw them?

18  A    Yes, ma'am.

19       MS. STOCKARD:  Your Honor, I'd ask that Government's

20  Exhibits No. 3, 4 and 5 be admitted into evidence.

21       MR. HUFFMAN:  No objection.

22       THE COURT:  Three, 4 and 5 will be admitted.

23  Q    (By Ms. Stockard) I'm going to put up what's been

24  marked Government's Exhibit No. 3.  Can you explain to the

25  Court what that is?

1    A    That is the suspect's vehicle after it struck the wall at
2    St. Agnes Cathedral.
3    Q    And that was the end of the chase?
4    A    Yes, ma'am.
5    Q    Then I'm going to put up Exhibit No. 4.  What is that?
6    A    That is a firearm that's wedged between the windshield
7    and the hood area of the vehicle.
8    Q    Then let me put back up 3.  We don't have a side view of
9    this but as you're looking at Government's Exhibit 3, as you
10   saw it were the hood and the windshield kind of accordioned
11   and crunched?
12   A    Yes, ma'am.
13   Q    I'm going to put back up Government's Exhibit No. 4.  So
14   as we look at this here, the black metal part on the left
15   that's kind of going up, is that the hood of the vehicle?
16   A    Right.
17   Q    And then to the right the windshield kind of collapsed
18   in?
19   A    Correct.
20   Q    Then I'm going to put up Government's Exhibit No. 5.
21   What is that?
22   A    That's an AR-15 magazine that was located in the trunk of
23   the vehicle.
24        MS. STOCKARD:  I don't have any other questions for
25   Corporal McCain.  I don't know if Mr. Huffman has.

```
 1              THE COURT:  Cross-examination.

 2              MR. HUFFMAN:  Just a few.

 3                      CROSS-EXAMINATION

 4  BY MR. HUFFMAN:

 5  Q    Good morning, sir.

 6  A    Good morning.

 7  Q    Just a few questions just so I'm clear on the pictures

 8  that we see.

 9              The point of impact as far as the vehicle and the

10  church, was there a determination that was made as to whether

11  it was hit from passenger side or the driver's side to hit

12  first?

13  A    I don't know if there was an official determination but

14  it appeared the front of the vehicle hit the wall.

15  Q    And clearly we can see substantial amount of damage to

16  the vehicle; is that correct?

17  A    Correct.

18  Q    Items kind of thrown almost everywhere in and around the

19  vehicle, is that correct, with debris?

20  A    There was a lot of debris around the vehicle.

21  Q    The exhibit that shows the firearm and the windshield, is

22  that the passenger side or the driver's side?

23  A    It was towards the passenger side.

24  Q    The magazine in the back that we see in the exhibit, was

25  that an item found in the trunk or somewhere else?
```

27

```
 1   A    In the trunk.

 2   Q    And it looks like it's in something.  I see the Frosted

 3   Flakes box there.  Is it in a bag or is it in something else?

 4   A    It was just sitting in the trunk.

 5   Q    Sitting in the trunk?

 6             And are there any things surrounding the magazine

 7   that showed that it was Mr. McDonald's item?

 8   A    No.

 9   Q    Do you know if the magazine was sent off for prints or

10   DNA?

11   A    I do not know.

12   Q    The gun that we see in the picture, do you know which gun

13   that is?

14   A    Yes.

15   Q    Which gun was that?

16   A    It was a foreign made 7.62 caliber gun loaded with

17   32-caliber cartridge.

18   Q    Was that a Glock model or was that a J.P. Sauer & Sohn?

19   A    J.P. Sauer & Sohn.

20   Q    As far as where that gun would have been prior to the

21   crash, do you have any knowledge or understanding where that

22   would have been?

23   A    No.

24   Q    Can you tell or is there any testing that could have been

25   done as to whether that came from the passenger holding it or
```

28

1  some other location within the vehicle or just even up on the
2  dashboard?
3  A    Could you restate the first part of the question?
4  Q    Sure.  I combined two in one.
5         The gun itself, would you be able to tell from where
6  in the vehicle it came from before being lodged in the
7  windshield in that manner?
8  A    No.
9  Q    The vehicle itself, do you know whether it -- after
10 hitting did it turn, did it overturn?  Do you have any
11 understanding of the dynamics of the actual crash itself?
12 A    Yes, I have an understanding of the dynamics of the
13 crash.
14 Q    Did the vehicle itself overturn in any manner, to your
15 knowledge?
16 A    No.
17 Q    Basically, it hit the church and bounced back and then
18 came to a resting spot; is that your understanding?
19 A    It's my understanding it hit the wall and -- which turned
20 it south.
21 Q    During the chase itself I understand that you were
22 substantially a little bit behind.  Did you ever see any items
23 being thrown out of the windows?
24 A    I personally did not.
25         MR. HUFFMAN:  Thank you.

```
1              No further questions.

2              THE COURT:  Redirect?

3              MS. STOCKARD:  No redirect.

4              THE COURT:  You may step down.

5              MS. STOCKARD:  United States would call Officer

6   Steve Hartman.

7              THE COURT:  Come forward, raise your right hand to

8   be sworn.

9   STEVE HARTMAN, GOVERNMENT'S WITNESS, SWORN:

10                      DIRECT EXAMINATION

11  BY MS. STOCKARD:

12  Q    Would state your name for the Court, please.

13  A    Steven Hartman.

14  Q    And what do you do for a living?

15  A    Police officer with the City of Springfield.

16  Q    On August 8th of 2018, were you working in that capacity?

17  A    Yes.

18  Q    And were you riding that day in a patrol car with

19  Corporal Josh McCain?

20  A    Yes.  Unfortunately, yes.

21  Q    Were you and he involved in the chase of a black BMW on

22  that date?

23  A    Yes.

24  Q    While you were -- were you driving or was he driving?

25  A    He was driving.  I was riding in the front passenger
```

                                    30

1   seat.

2   Q    And during the course of that chase did you see anything

3   come out of the vehicle?

4   A    Yes.

5   Q    Could you describe that, please?

6   A    It was a black-in-color rifle.  I saw it come from the

7   driver's side of the vehicle, fly through the air and land on

8   the street.

9   Q    Do you remember approximately -- and I can put up --

10  Government's Exhibit No. 2 is kind of a map of the area that's

11  been already admitted.  I'll get that up on the screen.

12            On here, do you know where this is in Springfield?

13  Can you see the map in front of you?

14  A    There's nothing on here.

15  Q    Is it on there now?

16  A    Yes.

17  Q    Are you familiar with that area of Springfield?

18  A    Yes.

19  Q    Is that the area that you were in on that date?

20  A    Yes, it is.

21  Q    Kind of using that map to orient us, about where did you

22  see that firearm come out of the driver's side of the vehicle?

23  A    Just west of Kimbrough Avenue on Cherry Street, between

24  there and Thomas Avenue, I believe, or Thomas alley.

25

31

```
 1  Q    So right about here?

 2  A    Yes.

 3            MS. STOCKARD:  I don't have any other questions for

 4  him.

 5            THE COURT:  Cross?

 6            MR. HUFFMAN:  Thank you.  Just briefly.

 7                        CROSS-EXAMINATION

 8  BY MR. HUFFMAN:

 9  Q    Officer Hartman, you indicated you saw it come out of the

10  driver's side but could you tell whether it was the driver or

11  the rear passenger that had thrown it out?

12  A    I could not tell.

13  Q    Did you see any of the other items thrown out of the

14  vehicle?

15  A    No.

16  Q    When you arrived at the scene, were the windows of the

17  vehicle down or up or were they just shattered at that point?

18  A    The driver's front window, side window was down, the

19  driver's side rear side window was up.  It was open, maybe 4

20  or 5 inches open.

21  Q    As far as the passenger side, was the passenger windows

22  open at all as well?

23  A    I don't recall.  When we approached, we were approaching

24  on the driver's side.

25            MR. HUFFMAN:  Thank you.
```

Case 6:18-cr-03084-MDH   Document 43   Filed 06/19/19   Page 32 of 76

```
 1              Nothing further.
 2              THE COURT:  Redirect?
 3                      REDIRECT EXAMINATION
 4  BY MS. STOCKARD:
 5  Q    Officer, the driver's side back passenger window, was
 6  there anything covering that window inside or anything like
 7  that that you recall?
 8  A    Yeah, there was like a shade, a sun shade.
 9  Q    Do you recall, was that attached to the window or was it
10  attached to the inside of the car?
11  A    I didn't look specifically where.  I believe Corporal
12  McCain removed it at some point.
13              MS. STOCKARD:  No further questions.
14              THE COURT:  Recross?
15              MR. HUFFMAN:  No, Your Honor.  Thank you.
16              THE COURT:  Thank you, Officer.  You can step down.
17              MS. STOCKARD:  United States calls Sergeant Justin
18  Gargus.
19  JUSTIN GARGUS, GOVERNMENT'S WITNESS, SWORN:
20                      DIRECT EXAMINATION
21  BY MS. STOCKARD:
22  Q    Would you state your name for the record, please?
23  A    Justin Gargus.
24  Q    And what do you do for a living?
25  A    I'm a sergeant with the Springfield Police Department.
```

33

```
1    Q    I want to take you to August 8th of 2018.  Were you

2    looking for a person named Clinton McDonald on that day?

3    A    Yes.

4    Q    Did you locate him that day?

5    A    Yes.

6    Q    Where did you locate him?

7    A    He was in a black 2006 BMW traveling in the alleyway

8    behind thousand block of East Walnut.

9    Q    The vehicle that he was traveling in, did it have a

10   license plate on it?

11   A    It had a Missouri temporary tag.

12   Q    Did you run that tag?

13   A    Yes.

14   Q    And what did it come back as or to?

15   A    It checked to a different vehicle but it checked to

16   Clinton McDonald.

17   Q    Once you saw Mr. McDonald in the -- was it a black BMW?

18   A    Yes.

19   Q    -- what did you do then?

20   A    I asked for other officers to come make the stop.  I was

21   in a covert vehicle in plain clothes, didn't have the ability

22   to make traffic stops.  I didn't have any equipment to do that

23   with.

24   Q    And did they attempt to make the stop on Mr. McDonald?

25   A    Yes.  I requested Corporal McCain and Steve Hartman, they
```

34

1   were riding together in an enforcement car, I asked them to

2   make the stop.

3   Q    Did Mr. McDonald stop when they --

4   A    No, he did not.  He fled.

5   Q    And did you follow that chase?

6   A    Yes.  I authorized a pursuit and followed the path of the

7   pursuit.  Because I wasn't in an enforcement car, I couldn't

8   engage in the pursuit but I followed the path of it.

9   Q    And as you were following, were you on the radio with

10  Officers McCain and Hartman?

11  A    Yes, briefly.  I was trying to stay off the radio so they

12  could broadcast information.

13  Q    Did you hear Officer Hartman say that something had come

14  out of the vehicle?

15  A    Yes.  As they were traveling west through the

16  intersection of Kimbrough and Cherry on Cherry Street, Officer

17  Hartman broadcast that he observed a rifle being thrown from

18  the vehicle.

19  Q    And did you come up to that spot?

20  A    I did.  I had located the rifle on the street.

21  Q    I'm going to show you what's been marked Government's

22  Exhibit No. 6.  Do you recognize what I've handed you?

23  A    I do.

24  Q    What is that?

25  A    It's a photograph of the rifle that I located in the

35

1    street.

2    Q    And is that a fair and accurate depiction of that?

3    A    It is.

4         MS. STOCKARD:  Your Honor, I'd ask that Government's

5    Exhibit No. 6 be admitted into evidence.

6         MR. HUFFMAN:  No objection.

7         THE COURT:  Six will be admitted.

8    Q    (By Ms. Stockard) Kind of -- you explained this was

9    west of Kimbrough.  On the photo here we can see there's

10   some cones kind of on the left side of the photo and it

11   looks like that's a street or an alleyway.  Does that have a

12   name?

13   A    It does.  It's Thomas Avenue or Thomas alley.

14   Q    So I'm going to put back up what's been previously

15   admitted and marked as Government's Exhibit No. 2.  So is that

16   right about here?

17   A    It is.

18        MS. STOCKARD:  I do not have any other questions for

19   him.

20        THE COURT:  Cross-examination?

21                    CROSS-EXAMINATION

22   BY MR. HUFFMAN:

23   Q    Good morning.

24   A    Good morning.

25   Q    You had indicated that you were looking for Mr. McDonald

36

1    that time on a PC item; is that correct?

2    A    Yes.

3    Q    And he was a potential person with information as to a

4    homicide regarding one of his family members?

5    A    Yes.  It was a family member or a close associate that

6    was killed in a homicide.

7    Q    Was that at or around the same time frame as this

8    incident?

9    A    Yeah.  I don't recall the exact date.  That was probably

10   a week or two prior at the most.

11   Q    And when you heard over the radio that the item had been

12   thrown out of the vehicle, it wasn't determined as far as who

13   had thrown out the weapon; is that correct?

14   A    Correct.  It was just broadcast that a rifle had been

15   thrown from the vehicle.

16   Q    And didn't indicate from the driver or passenger side; is

17   that correct?

18   A    I don't believe they stated at that point.

19   Q    As far as when it was thrown out, I know the exhibit

20   shows the gun laying to the side of the road; is that correct?

21   A    It's in the middle of the road.

22   Q    In the middle.

23        And so as far as from where it lays right now, we

24   can't tell as far as if it was thrown out of the passenger or

25   the driver's side; is that fair to say?

37

```
 1   A     Yes.

 2              MR. HUFFMAN:  Nothing further.

 3              THE COURT:  Redirect?

 4              MS. STOCKARD:  No, Your Honor.

 5              THE COURT:  May the sergeant be excused?

 6              MS. STOCKARD:  Yes.  Thank you.

 7              THE COURT:  Thank you, sir.

 8              THE WITNESS:  Thank you.

 9              MS. STOCKARD:  United States would call Thomas

10   Bostic.

11              THE COURT:  Sir, if you'll come forward, raise your

12   right hand to be sworn.

13   THOMAS BOSTIC, GOVERNMENT'S WITNESS, SWORN:

14                      DIRECT EXAMINATION

15   BY MS. STOCKARD:

16   Q     Would you state your name, please.

17   A     Thomas Bostic.

18   Q     I want to take you back to August 8th of 2018, about

19   three in the afternoon.  What were you doing around that time?

20   A     I was driving a shuttle bus.

21   Q     Were you on the Missouri State campus?

22   A     Yes.

23   Q     Did you see anything unusual at that time?

24   A     I seen the black car coming down the road and he was

25   driving fast.
```

38

```
1   Q    Was that on Cherry Street?

2   A    Yep.

3   Q    And as you saw the car go by, did you see anything the

4   car or the people in the car were doing?

5   A    I did not see the people.  I did see them throw something

6   out the window, which I went to the sidewalk and tried to

7   figure out what it was and then I walked across the road and

8   it was a gun.

9   Q    So let's kind of take that back a little bit.  You said

10  you saw somebody throw something out of the window.  Do you

11  recall what window they threw it out of?

12  A    I cannot tell you for sure.

13  Q    And the item that you saw thrown out of the vehicle, you

14  said you went and found it, and what was it when you came upon

15  it?

16  A    What's that again?

17  Q    When you finally got to it, what was it?

18  A    It was a gun.

19  Q    I'm going to show you what's been marked Government's

20  Exhibit No. 7.  Do you recognize what I've handed you?

21  A    Yep.  I walked across the street, called 911.

22  Q    Is that a fair and accurate depiction of the item that

23  you found on that date?

24  A    Yep.

25              MS. STOCKARD:  Your Honor, I'd ask that Government's
```
39

```
 1   Exhibit No. 7 be admitted into evidence.

 2              MR. HUFFMAN:  No objection.

 3              THE COURT:  Seven will be admitted.

 4   Q    (By Ms. Stockard) Mr. Bostic, this shows -- is it

 5   Cherry Street in front of us?

 6   A    What's that again?

 7   Q    Is this Cherry Street that we're looking at in the photo?

 8   A    Yep.

 9   Q    And this is -- the parking garage is on --

10   A    That's the parking garage and the shuttle stop's just

11   across from it.

12   Q    Okay.

13   A    It's on the west side of it.

14   Q    You were over here to the west side?

15   A    Yeah.  I don't remember if I was pulling out or pulling

16   in.

17   Q    Okay.  So you saw the item come out.  What did you see

18   the item do when it came out?

19   A    Well, I wasn't sure when I seen it come out, I didn't

20   know for sure until I decided to walk across the street and

21   look.

22   Q    Did you notice if the firearm was -- could you tell if it

23   was loaded or not when you came up on it?

24   A    It was loaded.  You could see the bullets because it'd

25   broke open.  911 told me to make sure nobody touched it, so I
```

```
 1   stood there until the police came.
 2   Q    Okay.
 3            MS. STOCKARD:  I don't have any further questions
 4   for you; Mr. Huffman may, so if you'll just stay where you
 5   are.
 6            THE COURT:  I got a couple questions.
 7            How do you spell your last name, sir?
 8            THE WITNESS:  B-O-S-T-I-C.
 9            THE COURT:  She didn't cover this exactly, but the
10   parking garage sits on the north side of Cherry?
11            THE WITNESS:  The parking garage would be on the
12   south side.
13            THE COURT:  On the south side of Cherry?
14            THE WITNESS:  And Cherry goes --
15            THE COURT:  East/west.
16            THE WITNESS:  No, it would have been --
17            THE COURT:  All right.  That's good.  That's all.
18   Thank you.
19            Go ahead.  Cross-examination?
20            MR. HUFFMAN:  No questions.  Thank you.
21            THE COURT:  All right.  You may step down.  Thank
22   you, sir.
23            MS. STOCKARD:  Thank you.
24            I don't have any further evidence.
25            THE COURT:  All right.  Does the defense wish to
```

41

1    present any evidence?

2           MR. HUFFMAN:  No, Your Honor.

3           THE COURT:  Ms. Stockard, do you want to be heard on

4    any of the legal issues?

5           MS. STOCKARD:  Actually, before I close I would like

6    to admit into evidence the records of the felonies of Akeem

7    Lynn.  Those are Government's Exhibits No. 8, 9 and 10.

8           THE COURT:  Lynn is a --

9           MS. STOCKARD:  Mr. Lynn was the back seat passenger.

10          THE COURT:  Was an occupant of the vehicle at the

11   time of the crash?

12          MS. STOCKARD:  Yes, sir.

13          THE COURT:  Any objections?

14          MR. HUFFMAN:  No, Your Honor.

15          THE COURT:  Then 8, 9 and 10 will be admitted.

16          MS. STOCKARD:  Would you like to look at these, Your

17   Honor?

18          THE COURT:  I'm sorry?

19          MS. STOCKARD:  Would you like to look at these?

20          THE COURT:  Yes, please.

21          MS. STOCKARD:  I'll hand them to the courtroom

22   deputy.

23          THE COURT:  Ms. Stockard, you may be heard.

24          MS. STOCKARD:  Thank you, Your Honor.

25          So most of the defendant's objections centered

around his possession of the various firearms and I think it's important to think about first the firearm that he admitted to possessing.  That was the firearm that was in the front -- the front passenger floorboard.  That's the one he has pled guilty to possessing.  So I think in some regards you have to view the rest of the firearms in light of that one.

Kind of taking them one by one, there is the firearm that is in the windshield of the vehicle after the crash.  We don't know everything about the crash and the mechanisms and all of that but I think if you're thinking about a firearm that comes from the inside of the vehicle and gets lodged in the windshield of the vehicle, that firearm is out in that vehicle, so I think it is logical to conclude that the defendant had both knowledge and access to that firearm. Either he did or he had that through one of the co-defendants.

There is also -- maybe kind of back down the chase now.  There's a Palmetto PA-15.  As the Court saw from the photo, this firearm, as Officer Hartman testified, came out of the driver's side of the vehicle.  It's a pretty large firearm.  It would be pretty hard to miss in your car.  Not something somebody could necessarily put in their pants or in their pocket.  This is August, so nobody's probably wearing a coat.  This isn't something that would be hidden.  This is something that he had knowledge of and something that he had access to and I think the Court can make that conclusion based

43

1    on the evidence before it.

     2            You've got that -- as Sergeant Gargus testified,

     3    this vehicle -- defendant was driving it, first of all.  It

     4    also had a tag on it.  It was registered to him.  That firearm

     5    in particular, there was an accessory for that firearm in the

     6    trunk of the vehicle that he was driving and that the tag was

     7    registered to him.

     8            Then the firearm that was found further on down the

     9    street -- the one that Mr. Bostic found on Cherry Street --

    10    also came from the vehicle.  Again, that's a smaller firearm

    11    but it also came from that vehicle.

    12            I think all of this has to be viewed in the context

    13    that the defendant was driving this vehicle to get away from

    14    police.  That was very clear.  As he's driving to get away

    15    from police, what the people in that vehicle are doing while

    16    he's driving are throwing guns out of the vehicle.  They're

    17    throwing guns out to make sure that the officers don't find

    18    what they don't want them to find.

    19            And I think if you take into account all of that

    20    together:  The defendant's driving the vehicle, the tag is

    21    registered to him, he's the one who flees from the officers,

    22    it's not clear whether he threw any of the guns out or his

    23    friends threw any of the guns out, but what you need for

    24    possession is knowledge and control.  And that doesn't have to

    25    be his control, it can be through another person, but I think

                                         44

1    in this case all four of those firearms he had knowledge of

2    and he had control of.

3            The other argument that I made in my sentencing memo

4    is that he also -- if the firearm was thrown by Mr. Lynn,

5    particularly the Palmetto which we know was thrown out of the

6    driver's side, then he aided and abetted as relevant conduct

7    his possession of that firearm as a felon and that also would

8    be involved in the offense.

9            So I would argue and ask the Court to overrule his

10   objections to the three to seven firearms, the stolen firearm.

11           And then do you want to talk about those first and

12   then I'll go on to the obstruction of justice in connection

13   with another felony offense or --

14           THE COURT:  Talk about the in connection with

15   another felony offense issue.

16           MS. STOCKARD:  Sure.  And I think there are a couple

17   different options there.  There's the drugs -- and it doesn't

18   have to be a distribution offense for the firearm to have been

19   found in connection or furtherance of.  It can be a possession

20   offense.  And the case law is pretty clear that just a

21   possession and having a firearm is enough because that can

22   embolden that person's possession of the drugs even if it's in

23   a user amount.  Defendant has admitted that he did possess the

24   one firearm in the vehicle, there were the drugs.

25           But I think the stronger enhancement there is the

felony fleeing.  As I noted in my sentencing memo, fleeing

from an officer is a felony if a person flees in such a manner

that the person fleeing creates a substantial risk of serious

physical injury or death to any person.

I think, Your Honor, you saw the video, you saw the

photo of the vehicle after the crash.  I think the defendant

going -- you saw Officer McCain's miles per hour.  He got up

to about 70 miles per hour on Cherry Street, downtown

Springfield in the middle of the afternoon.  You can see the

other cars around, you can see pedestrians around, and then

you see what happened to the defendant's vehicle.  I think

that is quite clearly felony fleeing.

And the case law is clear that if that firearm --

there was at least two still in the vehicle by the time he

crashed -- emboldened the defendant, then that firearm was

used in connection with that felony offense.  I think that is

a reasonable conclusion for the Court to make here.

THE COURT:  Let me ask you some questions here.

The -- in the plea -- there's no plea agreement so

plea colloquy -- he admitted possession of one weapon,

correct?

MS. STOCKARD:  Correct.

THE COURT:  But that is not the weapon that is on

the windshield?

MS. STOCKARD:  Correct.

1              THE COURT:  That is not the handgun that has been --
         2     allegedly was allegedly thrown out of the vehicle?
         3              MS. STOCKARD:  Correct.
         4              THE COURT:  All right.  Do you think that if -- if
         5     the weapon that is thrown out of the vehicle, the handgun that
         6     he did not admit possessing, it seems to be on the side of the
         7     car from the passenger side, as I understood the -- where
         8     Cherry Street is and -- would that be on the passenger side of
         9     the car?
        10              MS. STOCKARD:  I'm not really clear on that.  It was
        11     my understanding that that was on the south side of the
        12     street.  Because when you look at the --
        13              THE COURT:  He said the parking garage was on the
        14     south side of the street.
        15              MS. STOCKARD:  He did.  I think he is -- if you look
        16     at the map, I think he was mistaken about that.
        17              THE COURT:  Yeah, I thought the parking garage was
        18     on the north side of the street but I --
        19              MS. STOCKARD:  I can throw the map back up there.
        20              THE COURT:  Do you agree that the knowledge of
        21     the -- whether or not it's stolen is unimportant; it's just
        22     the ultimate fact of whether it's stolen?
        23              MS. STOCKARD:  I think the case law is clear that
        24     the defendant doesn't have to have knowledge -- for the
        25     purposes of this sentencing enhancement does not have to have
                                            47

```
 1    knowledge that it's stolen.

 2              THE COURT:  All right.  The --

 3              MS. STOCKARD:  I think for purposes of what side it

 4    was thrown out of, if it was thrown out of the driver's side

 5    or the passenger side, honestly, even if it's thrown out of

 6    the passenger side --

 7              THE COURT:  I'm not saying that's conclusive.  I

 8    guess what standard do you think is applicable to my finding

 9    here?  Do I have to find by a -- beyond a reasonable doubt,

10    clear and convincing evidence, more likely than not?

11              MS. STOCKARD:  I believe it's a preponderance

12    standard.

13              THE COURT:  You think it's a preponderance standard?

14    I know in our plea agreements we always put a preponderance

15    but in the absence of a plea agreement I was wondering what

16    you thought the standard would be here.

17              MS. STOCKARD:  I know it's not beyond a reasonable

18    doubt.  I believe it is a preponderance standard.

19              THE COURT:  Would that be in your sentencing

20    memorandum?

21              MS. STOCKARD:  I didn't see it in there as I was

22    glancing at it.

23              THE COURT:  Mr. Huffman, do you want to chime in on

24    that issue?

25              MR. HUFFMAN:  That's what I was looking up, Judge.
```

                                      48

```
 1    I thought when there isn't a plea agreement and it's not a

 2    fact contained within the plea agreement that it was a clear

 3    convincing -- and there was a case I remember reading but I'm

 4    trying to remember and make sure that I'm not misunderstanding

 5    what my memory is.

 6            THE COURT:  Anybody have anymore arguments they want

 7    to make on these objections?

 8            MS. STOCKARD:  I think there was one more I wanted

 9    to address.

10            MR. HUFFMAN:  The grouping as well you made an

11    objection to.

12            MS. STOCKARD:  To what?

13            MR. HUFFMAN:  The grouping.

14            MS. STOCKARD:  I don't want to -- I think the only

15    thing that I wanted to address, I know the defendant had

16    objected to the obstruction of justice, and the argument for

17    the obstruction of justice is very similar, actually, to the

18    argument that is a felony fleeing case.  The Court saw the

19    video, the Court saw the miles per hour, the Court saw the

20    picture of the car afterwards, so I do think that that is also

21    a valid enhancement that should be imposed in this case.

22            THE COURT:  Mr. Huffman, anything further you want

23    to argue?

24            MR. HUFFMAN:  Judge, very briefly.

25            Obviously, our position is, of course, on the
```

1  testimony, the windshield in and of itself, the government

2  talked a little bit about the mechanics of the crash and

3  that's correct, we don't have knowledge or understanding of

4  the absolute mechanics of the crash and so therefore whether

5  the gun was out at the time of the incident or just before, we

6  don't have any testimony as to whether one of the passengers

7  was holding the gun at the time of the crash, they were trying

8  to either get rid of it, whether it was laying on the

9  windshield, whether it was in some other part of the car.  So

10  I do believe that when there is that kind of doubt and

11  question that that should be held for the defendant in any

12  sort of enhancement before we get to that aspect.

13        As far as the Palmetto, obviously I know the witness

14  testified that he did not recall which side it came out of.

15  Obviously, there's no evidence that the passenger window with

16  the sun screen wasn't sufficient, couldn't be pulled down,

17  moved up and down, modified in order to throw anything out.

18  So we still feel that there's not sufficient showing of

19  evidence for those enhancements even by the exhibits that have

20  been presented.

21        There's been no testimony as to the length of the

22  Palmetto; that is, whether it's a short barrel, long barrel,

23  whether it's 16 inches, 2 feet, 24 inches, whether it could be

24  easily concealed, whether it wasn't, whether items of clothing

25  were being worn by the other individuals within the vehicle

1    that could have hid it or whether a blanket, coat, anything of
2    that nature.  So, again, I feel that the evidence as presented
3    by the government does not overcome the objections as
4    previously stated.
5            THE COURT:  Here's my thinking.  Let's take them in
6    the order.  Paragraph 21, the objection there.  It's my
7    opinion that the enhancement is appropriate -- the base
8    offense level in the presentence investigation is appropriate.
9    I will overrule the objection.
10           I think the Palmetto, there's sufficient evidence it
11   came from the driver's side.  I think it's sufficient evidence
12   that the back driver's side window wasn't where it could have
13   easily been thrown out of.  I think it's a large enough weapon
14   that the idea that it would have been in the car without
15   defendant's knowledge is just not very credible, especially
16   since the magazine is in his trunk.  So the Court overrules
17   that objection.
18           As to the three to seven firearm enhancement which
19   is in Paragraph 22, since the Court's found that the
20   Palmetto -- and the defendant admitted one handgun and then
21   the Court has found that the Palmetto was in his possession,
22   then the only question is is there another weapon.  We have
23   two to choose from.  One is the stolen handgun that was thrown
24   from the vehicle and the other is the one that is ultimately
25   located up in the -- on the windshield there following the

                                    51

1    crash.

2          The Court finds that I don't know how that weapon

3    could have gone from a concealed position on a defendant,

4    under a shirt or in a holster, and suddenly end up on the

5    windshield, so the Court does find that one is in the

6    possession -- it may be joint possession, but the defendant

7    was the driver and had certainly -- was a felon and not to be

8    in possession of a firearm and I think most likely that was

9    either in the hand of the passenger or the driver or was on

10   the dashboard and I think that's close enough to be in his

11   constructive possession even if it's joint.

12          As to the weapon that was thrown out, would you --

13   let me have that Google map one more time.  I want to make

14   sure.  On appeal this won't be obvious, but this whole event

15   occurred in -- about two to three blocks from the courthouse

16   and streets that we drive frequently.  Contrary to what the

17   testimony was, the -- the Court is aware that the parking

18   garage in the one picture near where the handgun was found is

19   on the north side of Cherry Street and that -- do you have a

20   picture also of where the handgun was found?

21          MS. STOCKARD:  I do, Your Honor.  It's government's

22   Exhibit No. 7.

23          THE COURT:  Right.  If I could see that one more

24   time?

25          And the handgun is found across the street from the

52

parking garage on the sidewalk which would mean that it was
either thrown over the top of the vehicle from the passenger
side or it would have been tossed from the driver's side, and
as said earlier, there was something blocking the rear
driver's side window that would have made it difficult.  So
seemed to me from the evidence that the logical conclusion is
it was thrown from the driver's side -- driver's front
passenger seat also.

I asked about the standard primarily because of this
one weapon.  I do think the evidence of this particular weapon
is not as strong as it is with the other three, but I'm
convinced that the driver knew of this weapon and had actual
or constructive possession, whether it was -- and it may have
been joint but -- so the Court does find that the enhancement
in Paragraph 22 is appropriate and the objection is overruled.

I note it only requires three firearms and not four
to trigger that enhancement anyway.

Because I found that the firearm which is exhibited
in Government's Exhibit 7 was possessed by the defendant, then
that makes the two-level increase for being a stolen firearm
applicable and that objection is overruled.

In terms of using it in possession with another
crime, I do have concerns that the evidence that he used it in
possession with another drug offense is not particularly
strong but the fleeing here I think is felony fleeing and I

1    would think that would support it.  I'm not finding that there
2    wasn't evidence of the narcotics -- I think it's close -- but
3    I think the easier decision there is -- pertains to the felony
4    fleeing, so I overrule the objection to 24.

5              As to 27, I think there's no question that the
6    method that the defendant fled in this case created a
7    substantial risk of death or serious bodily injury.  For the
8    record, Cherry Street is a border street to Missouri State
9    University which has 23,000 students and it's frequently
10   traveled by pedestrians and significant traffic.  My
11   recollection is there's like fraternity and sorority houses in
12   part of it, there's some student housing on another part of
13   it, there's a university building on one corner and then a
14   parking garage used by the -- actually, I think the health
15   sciences part of the university has buildings there on Cherry.
16   So I think it clearly is obstruction of justice that -- when
17   he puts people's lives in danger by operating the vehicle.

18             If we need any further evidence, look at the vehicle
19   at the end.  I'm frankly a little surprised nobody was
20   severely injured given the condition of the vehicle.  So the
21   Court overrules the objection to 27.

22             The Court, based on that, therefore, finds that the
23   defendant's offense level is 29 and the criminal history is
24   six.

25             Does the government wish to be heard beyond its

                                    54

sentencing memorandum on other issues relating to sentencing?

        MS. STOCKARD:  Just very briefly, Your Honor.

        As you stated, my memo does cover all of the 3553 factors.  I think —— and I argued this in the sentencing memo. We have a lot of different ways that we think about somebody, as a career offender, a 924(e) or under the guidelines, but when you look at this defendant's criminal history, I think the community would understand him and the government understands him to be someone who is a career offender —— to be a career offender because that's what he's chosen to be. He's chosen over and over again this is the choice that he's going to make, this is what he's going to do.  Even Count 1 in the case, he sold the morphine and codeine to the undercover Springfield police officer while he was a resident at the Alpha House.

        So I'm asking for 188 months on Count 1, 188 months on Count 2 and then 120 months on Count 3, which is the top of the guidelines.  I'm asking for the top of the guidelines based on the facts of the case, the history and characteristics of the defendant but also the fact that all of those show that he really has no respect for the law.

        In this case itself you see the car, you see the chase.  He's shown that he is a danger to the community.  But he also has this full bevy of other criminal cases, other criminal charges where he's demonstrated that as well.

1          He's also demonstrated that in terms of deterrence,

 2     only incarceration will do that, and I think that in

 3     particular demonstrates that a sentence at the top end of the

 4     guidelines is appropriate here.

 5          When I look at the guideline range, I do try and see

 6     aggravators and mitigators but I just don't -- I don't see any

 7     mitigators here for Mr. McDonald.  So I do think that a

 8     sentence at the top of the guideline range is appropriate for

 9     Count 1 and Count 2 and then a sentence at the top of the

10     statutory range is appropriate for Count 3.

11          Thank you, Your Honor.

12          THE COURT:  Mr. Huffman.

13          MR. HUFFMAN:  Thank you, Judge.

14          I did have a brief statement that was written by his

15     mother, who's present.  She didn't think she could actually

16     emotionally say that.  I can provide the copy to -- I was just

17     planning on reading it.

18          THE COURT:  Just read it into the record.

19          MR. HUFFMAN:  Thank you.

20          "To Whom it May Concern.  I have known Clinton

21     McDonald his entire life.  I am his mother.  He was raised in

22     a single-parent household.  He was the middle of three

23     children; two boys and one girl.  The girl was the baby.

24     Clinton was a great big brother, always tried to show his

25     little sister and big brother strength and character and

                                    56

|    |                                                                 |
|----|-----------------------------------------------------------------|
| 1  | leadership.  He loves sports; wrestling and football were his   |
| 2  | favorites.  When he was in high school, he took on a new        |
| 3  | adventure with DECA," D-E-C-A.  "He excelled in that as well.    |
| 4  | "Clinton is a very smart young man and has and can              |
| 5  | be a productive member of society if given another chance to    |
| 6  | do so.  He has two beautiful little twin boys and a little      |
| 7  | girl that misses him dearly and they need their father in       |
| 8  | their lives.  His son's names --" and I'll spell it "-- is      |
| 9  | M-I-K-I-H-A-I-L,  M-I-K-A-I-L, and N-A-K-I-L-A-H.               |
| 10 | "Please show mercy on my child.  I need my son.  We            |
| 11 | need him here.                                                  |
| 12 | "Thank you, Eartha McDonald."                                   |
| 13 | Judge, this is a case in which I've spoken with               |
| 14 | Mr. McDonald many times.  I've known Mr. McDonald for a few     |
| 15 | years at this point.  One of the things that he and I have     |
| 16 | talked about is initially when he was initially charged with   |
| 17 | the drug cases, if you look at the guideline on those          |
| 18 | particular cases without the grouping that was done within the |
| 19 | PSI, his actual base offense is 14 with a level 12 with a      |
| 20 | range of 30 to 37 months with acceptance of responsibility.    |
| 21 | That, as it stands alone, Counts 1 and Count 2, what his      |
| 22 | guidelines would be without any specific enhancements that we  |
| 23 | see within the PSI.  The enhancements, of course, are all      |
| 24 | grouped together in the felon in possession which has a        |
| 25 | maximum sentence of 120 months.                                |

Case 6:18-cr-03084-MDH   Document 43   Filed 06/19/19   Page 57 of 76

I feel somewhat a little disingenuous when we have a
stipulation of facts and understand that obviously everything
can be taken into consideration for purposes of sentencing,
but in that particular case obviously Counts 1 and Count 2
were very, very small guideline ranges, very small amounts of
drugs were related in each of those two incidents, one from
2016, multiple years before these incidents.

         The 2018 July 10th and then the August 8th of 2018
obviously were closer together in time, but I wanted to go a
little bit over some of the issues that went on in
Mr. McDonald's life at that time.  And we're not using those
as an excuse but, again, one of the things that when we
initially looked at guidelines, saw the enhancements on Count
1 and 2, 30 to 37 months, and now we've gotten basically to
151 to 188 with all the enhancements and related to the felon
in possession, a count that doesn't carry with it that amount
of time.

         Obviously, as the Court's aware, acceptance of
responsibility we look at very seriously.  The acceptance of
responsibility allows the government to utilize its resources
in a fundamental manner to avoid unnecessary trials and to
avoid time and expense both for the Court and for the
community in bringing in jurors.

         Mr. McDonald in this particular case accepted
responsibility, yet under the current guideline range I don't

feel that he receives much of a benefit for the plea of
guilty.  I understand that three levels would have continued
to increase his range of punishment as a Level 6 but at the
same time the maximum level on the gun charge at this point
would have been 120 months.  I recognize under the career
offender and all the enhancements that that's part of his
criminal history, it's part of what we have to deal with when
we're representing an individual in these circumstances;
however, we don't feel that a range of 151 to 188 accurately
sets forth the factors contained within 3553.

         One of the things that Mr. McDonald and I have
talked about is a little bit of kind of the chaos that he had
lived his life in, unfortunately, and some of the benefits of
looking forward, especially under the First Step Act.  As the
Court's aware, the First Step Act doesn't necessarily impact
our particular case in any manner although it does allow the
defendant an opportunity to engage hopefully in treatment and
education within the Bureau of Prisons.

         Some of the things, for example, contained in the
sentencing memo of the government go back to late 2008 when it
talks about a contempt issue with the Court and it goes all
the way back to try and show, in some form or another, that
Mr. McDonald was not a suitable candidate for society.
However, that was the situation when he was 18 years old and
unfortunately over a video polycom made the statement while

1   under the influence of Xanax.  Again, it doesn't justify any
2   comments that he may have made to the Court but he received
3   two additional days on top of his 24-hour hold and woke up
4   three days after he was actually seen by the Court
5   unfortunately with no recollection of what had actually
6   happened.

7           Now, I know this Court and his family would have
8   liked to have seen growth at that time for Mr. McDonald in
9   showing a level of maturity, but unfortunately it's taken a
10  little bit longer.

11          In the time that I've had the opportunity to meet
12  and deal with Mr. McDonald and represent him, he's gotten
13  married, he has been more engaged and involved in his family
14  life and dynamics.  He recognizes that he has the ability to
15  be a very productive member of the community.  As stated by
16  his mother, he's a very smart individual who unfortunately up
17  to this point has maybe not utilized his talent in the manner
18  that is best for himself, his family and society.

19          But when we look at the purpose of the First Step
20  Act, the First Step Act, in my opinion, its principles apply
21  to Mr. McDonald; the principles of rehabilitation, the
22  principles of not looking at rehabilitation and warehousing
23  people in long sentences for purposes of incarceration.

24          In fact, I know when you look on the website at the
25  First Step Act, one of the things that it shows is the inmate

leaving the prison cell in a orange suit and walking into
society hopefully better educated, better trained, in a better
position to interact with and to be part of our community.

The purpose and nature behind the First Step Act was
that the federal system, and specifically the prison system,
is failing. I think it's obviously something that we've seen
across both the state and the federal system. And what we're
doing is we're not putting our inmates in a position where
they can come out better.

Now, again, I'm not coming up here and saying that
that's -- Mr. McDonald in any way factored into that as far as
in his past but I do think in the past he himself personally
wasn't ready to receive some of the benefits that hopefully
these new programs will allow for him to engage in.

Mr. McDonald recognizes that he's going to do some
time. We recognize that there needs to be punishment for the
behavior that has been exhibited and for the behavior and the
criminality and the acts that he has pled guilty to. He also
knows, though, that he wants to be part of this community
again. He wants to be part of his children's lives. He wants
to engage and learn resources so that he no longer will go
back to this offense type of history.

The last thing that we unfortunately are dealing
with is that during this time frame -- again, this is not
justification, I just want to make sure the Court is aware of

1    all the circumstances surrounding why Mr. McDonald had in his
2    possession a firearm.
3           One of the factors that was going on in his life at
4    that time was that an individual that he considered his
5    brother was shot and killed.  As referenced within the PSI,
6    there is reference to what they were looking for Mr. McDonald
7    during that time frame.  Mr. McDonald had learned that he was
8    actually the intended target of the shooting, that he himself
9    was supposed to be the one that was shot and killed.
10          Again, this does not justify Mr. McDonald's use of a
11   firearm or having in his possession a firearm, but I wanted to
12   at least give you a little bit of the moment in that time
13   where Mr. McDonald -- who was also actively utilizing
14   controlled substances and has a long history of controlled
15   substance -- was in a situation where he now is fearful that
16   he may be shot or killed.
17          THE COURT:  So had he stopped when he was supposed
18   to, he could have told that to the police.
19          MR. HUFFMAN:  He could have, Your Honor.
20          And as you're aware, we -- a lot of times in these
21   circumstances our clients do not make that kind of a rational
22   decision.  It would have made more sense had he -- obviously
23   at the time he was not interviewed, he was taken to the
24   hospital.  He suffered some very severe injuries of which was
25   not treated in the jail and I remember seeing him months

Case 6:18-cr-03084-MDH   Document 43   Filed 06/19/19   Page 62 of 76

1   afterwards still with a bulge in his arm.  And he's grateful
2   that he himself nor any of his passengers were killed in the
3   crash.  He's grateful that he did not injure a pedestrian or
4   anybody else along Cherry Street.

5           I know the Court is concerned about the 23,000
6   students.  On August 8th of 2018, school would not have been
7   in full session at that time.  I'm not sure about summer
8   school.  I think it's done by that point as well.  There would
9   not have been a full campus of individuals.  But that doesn't
10  take away the time of day, the nature and where it was
11  located, but this wasn't a full campus of individuals with
12  fraternities and sororities along that.  I've driven that road
13  myself many a times and understand the difference between that
14  location versus when school's in session and when it's not.

15          But in the end, one of the biggest things that
16  Mr. McDonald's looking forward to and under the First Step Act
17  it prioritizes people inside who need it the most, it moves
18  people closer to home so he'll have an opportunity to continue
19  to strengthen those family relationships that we've talked
20  about, it provides and expands compassionate release and most
21  importantly it allows Clinton an opportunity to get education
22  and it allows him an opportunity as he's older now and has a
23  better understanding of some of the issues going forward, to
24  utilize the BOP in the appropriate manner.  When he last went,
25  he still was young, he still wasn't making good decisions.  We

63

1   know that that continued.

2          The level of maturity I've seen this go-round I

3   believe puts him in a better position where a sentence in the

4   amount of 84 to 96 months is most appropriate under the

5   circumstances and 3553 factors.  I do not feel that a sentence

6   in the high range; that is, 188 months of the guidelines, is

7   an appropriate sentence in this particular case.  I do not

8   believe that when you look at the felon in possession, which

9   is the primary grouping which allowed for the enhancements to

10  be held against Mr. McDonald, actually allowed the guidelines

11  to go above and beyond the maximum as far as the felon in

12  possession.

13         So when you look at the totality of the

14  circumstances, including all the factors set forth in 3553,

15  his desire and willingness to enter a plea of guilty, his

16  desire to accept responsibility for the offenses in which he

17  was charged and the other factors as set forth, we believe a

18  sentence in that range is appropriate; that is, the 84 to 96

19  months.

20         THE COURT:  At one point your client had some state

21  pending charges?

22         MR. HUFFMAN:  Correct.  To my knowledge all state

23  charges have been dismissed upon federal indictment.

24         THE COURT:  Looks like they all arose out of the

25  same incident.

1          MR. HUFFMAN:  The initial charges came out of the

2     same chase, the resisting arrest charges.  Once Mr. McDonald

3     was indicted, all charges have been dismissed in the state

4     court and to my knowledge there was a civil petition as well

5     that was filed and Mr. McFarland dismissed recently as well.

6     So my understanding, as of right now there are no pending

7     charges against Mr. McDonald nor anything under advisement

8     against him.

9          THE COURT:  Does your client with to address the

10    Court?

11         MR. HUFFMAN:  Judge, I spoke with him yesterday and

12    then also today and he does not wish to make a statement to

13    the Court.

14         THE COURT:  Okay.  It's not required, just if he

15    wants to.

16         MR. HUFFMAN:  Yes, sir.

17         THE COURT:  Any reason why I shouldn't impose

18    sentence at this time?

19         MS. STOCKARD:  No, Your Honor.

20         MR. HUFFMAN:  No, Your Honor.

21         THE COURT:  All right.  Mr. McDonald, would you

22    stand.

23         Well, your case is troubling for several reasons and

24    it starts with your criminal history.  As I said at the

25    beginning, you're at the highest category the federal courts

1    recognize.  As the U.S. Attorney argued, there's no reason to

2    believe you're not going to commit another crime when you get

3    out.

4            You got to change or you're going to end up spending

5    the rest of your life in prison.  It's that simple.  We don't

6    want to put people in prison but it's my job to protect the

7    public from people who intend on committing crimes.  And you

8    got to find a lifestyle that doesn't include crimes or this is

9    what's going to happen for the rest of your life.  You're a

10   real young guy, you will be when you get done with this

11   sentence.  I will admit that the definition of young changes

12   when you get to be old like me, but you'll still be young.

13   But if you commit another crime, you'll go right back to

14   prison and that's where you're going to stay.

15           And without unnecessarily highlighting your criminal

16   history, it all started looked like you were 16 or 17 thinking

17   you didn't have to follow the law.  From little things like

18   driving without a license, driving carelessly, to 17 you were

19   already -- have possession of marijuana, stealing at 18,

20   possession again at 19.

21           PROBATION OFFICER:  Judge, I did a cursory check on

22   Case.net.  Those pending cases are still pending.

23           THE COURT:  They are still pending?

24           PROBATION OFFICER:  Yes.

25           THE COURT:  They've said they would dismiss them is

                              66

1   what you're telling me?

2          MR. HUFFMAN:  Correct.  Yes, Your Honor.

3          THE COURT:  At 19 another drug possession -- or

4   paraphernalia, still driving without a license, driving

5   without insurance, another possession still at 19, still

6   driving without a license at 19.  Don't know how many times

7   you have to be arrested before you learn you have to get a

8   license.  Another driving without a license at 20 and

9   possession of marijuana again.  So you had three years to

10  learn not to possess marijuana and you're still doing it.

11         You want to say something?  Let your lawyer approve

12  what you're going to say.  I don't want you to say something

13  that he doesn't want you to say.

14         MR. HUFFMAN:  Mr. McDonald was just wanting to point

15  out that a lot of those offenses occurred prior to his

16  incarceration and then he resolved as he was incarcerated and

17  so they weren't occurring after; they had actually occurred

18  but were filed later and then he pled guilty while

19  incarcerated to multiple offenses.

20         THE COURT:  All right.  But he was arrested for

21  driving without a license and continued to drive without a

22  license.  That's my point.

23         At age 20 here come the other element that has

24  damaged his life:  He's got a firearm when he's a felon.  So

25  by age 20 you've had three drug convictions and now you're --

                           67

you're driving, you've got guns.  From this Court, I'm just
being honest with you, what causes our community problems are
drugs and guns.  When the two get together, nothing good
happens.  And at age 20, ten years ago, you had drugs and guns
both in your life.

Then while in prison at 26, just four years ago, you
damaged jail property.  At 27, another possession of a
controlled substance after incarceration.  At 29, another
possession, just a municipal charge.  At 29, another unlawful
possession.  Then, of course, you have the charges that you're
in front of me for now.

I'll point out that while you're in the Bureau of
Prisons you received disciplinary actions for possessing drugs
and introducing drugs into the prison.

At what point are you going to understand that drugs
are messing your life up?  Here you are at 30 and you still
got drugs and guns in your life.  When you going to figure
that out?  And I want you to figure it out -- I don't want to
be putting you in prison -- but you haven't figured it out.
You're putting the public at risk, maybe your own life at risk
from what some of the indication is.  I can't keep you from
making bad decisions.  My only thing I can do is put you in
prison, and you don't give us much choice.

I see in here also there's reference to a gang
affiliation.  If that's true, that's just the third bad

element that you've allowed to control your life.  I saw you
went to high school at Parkview.  By the way, that's where I
went.  You didn't finish.  Frankly, contrary to your mother's
letter -- and I appreciate a mom's love for her child and I'm
not critical of it -- but your grade point average was .06 on
a 4-point scale and you were suspended from school for
fighting.

What you need in your life -- and you're probably
tired of people telling you this -- is more education, more
work, no drugs, no guns, and no gangs.  That's the formula for
you to stay out of prison.  That's the formula for you to turn
your life around.  More education, more work; no guns, no
gangs, no drugs.

And unless you think I'm picking on you, I want you
to know that that's the formula that everyone who is
successful in life follows.  Not picking on you, not making
you do something anybody else doesn't have to do but just
expecting you as a citizen to do what other people are
supposed to do.  That's what we expect of people.  That's how
you become successful.  Respect our laws, follow them and
work, get a job, get an education to help you get a better
one.  But from age 17 at least on, that's not the decision you
made.

Now you're 30.  You're a man.  The tolerance of
society for you continuing to live life your way is pretty

69

1    much coming to an end. And what we do is we give people long
2    jail sentences when that happens, and it's unfortunate.

3          I'm going to try to get you some help in prison, to
4    get you some counseling for your drug problems and your other
5    issues, get your GED. You had a chance to get your GED when
6    you were in federal prison last time and didn't do it. You
7    also, by the way, have a chance to get some good time and get
8    your -- under this First Step Act even you get maybe some less
9    time but not if you're going to be doing damage to the prison
10   facilities and not if you're going to be sneaking drugs in
11   prison. That's not going to get you ahead in life and that's
12   not going to get you out any earlier.

13         Yes?

14         THE DEFENDANT: That wasn't sneaking drugs into
15   prison violation.

16         THE COURT: I'm sorry?

17         THE DEFENDANT: I didn't get drugs in the facility
18   on that violation.

19         THE COURT: What was it, then?

20         THE DEFENDANT: It was a wine violation for
21   drinking.

22         THE COURT: Paragraph 91 says that while in the BOP
23   defendant received disciplinary action for possessing drugs
24   and alcohol on January 30 and introduction of drugs and
25   alcohol on November 14.

1        THE DEFENDANT:  That's what they word it as but

2   they're just all --

3        THE COURT:  But you say it was only alcohol?

4        THE DEFENDANT:  Yeah.

5        THE COURT:  Let me ask you this:  Were you supposed

6   to have alcohol?

7        THE DEFENDANT:  No.

8        THE COURT:  Are you better than -- you don't have to

9   follow the rules; is that it?

10       THE DEFENDANT:  No, I'm not --

11       THE COURT:  I understand, you're just trying to

12  clarify, and I appreciate that.

13       THE DEFENDANT:  Yeah.

14       THE COURT:  But you're missing the point.

15       THE DEFENDANT:  No, I got the point.

16       THE COURT:  The point is you got to follow the

17  rules.

18       THE DEFENDANT:  I got the point.  Trust me, I got

19  the point.

20       THE COURT:  Whether you like them or not, you got to

21  follow the rules.  That's how you get successful.  That's how

22  you stay out of prison for you, which is the most important

23  thing.  Just follow the rules.

24       In terms of sentencing, I agree with an argument

25  your lawyer made is that it is a bit of an anomaly that you

didn't have significant amounts of drugs -- at least that's
not been proven.  You may have had them but they weren't able
to prove it.  And that being a felon in possession is
certainly the -- what I'm going to say the crime of most
concern in this particular -- and it does result in a higher
guideline sentence than otherwise would be just for your drug
offenses.

But your lawyer and other defense lawyers correctly
argue that we ought to consider the totality of circumstances
when we sentence.  Sometimes that works to the benefit of the
defendant and sometimes when we look at related conduct it
doesn't.

And I am concerned about the number of weapons you
had.  I understand your argument that it was for personal
safety, but when you were sentenced and told not to have a
weapon, it didn't say, Unless you think you need one.  It said
not to have a weapon.  And I did -- I'm serious when I say
that they were just going to stop you to ask you questions.
And if you hadn't had all those weapons in your car, you could
have answered their questions and even told you that you think
you're a victim and told them who was coming after you.

I understand there's mistrust of the police,
especially from people who have had prior convictions, but in
retrospect the far better decision would have been to go to
the police when you were in trouble.  They were looking for

```
 1   you to talk to you anyway.

 2            All right.  I do think that you've committed a crime

 3   that requires punishment.  I do think that the public needs to

 4   be protected from you because you don't seem to be able to

 5   stay away from crimes.  I certainly want to deter people

 6   possessing the type of weapons that I found you possessed,

 7   especially those who have criminal records and who are

 8   involved in the drug industry even on whatever level.  And I

 9   think your criminal record is already reflected in the

10   guidelines.

11            So here's what I'm going to do.  It's the judgment

12   of this Court that defendant Clinton McDonald is hereby

13   committed to the custody of the Bureau of Prisons for 176

14   months on Count 1, 176 months on Count 2, 120 months on Count

15   3, all to be served concurrently.

16            Upon release from imprisonment the defendant will be

17   placed on supervised release for three years.  That's three

18   years on each of the counts.  They will all run concurrently.

19   Not imposing any fine.  You do have to pay the $100 special

20   assessment per felony which is due immediately.

21            While you're on supervised release you'll comply

22   with the mandatory and standard conditions adopted by the

23   Court.  In addition, you'll comply with the special conditions

24   listed in Part D of the presentence investigation report.  I

25   am going to recommend that you be enrolled in an institution
```

in the 500-hour RDAP program.  I don't know if you've already participated in that or not but I'm going to encourage you to do that because I do see a history of drug abuse both -- multiple drugs according to the presentence investigation report.  Also I'm going to recommend that you be -- participate in the UNICOR program.  That's a job training program so that you can get out of prison, you'll have a skill that you can go get a job.

And, finally, I know the Bureau of Prisons will do this automatically but I so encourage you to get your GED and if you have the opportunity to pursue further education, even if it's job training beyond the UNICOR program so that when you get out you can find something to do other than sell drugs, possess guns and hang out with gang members.  I don't want to over-emphasize the gang members.  I understand that you're -- that that's not what caused you here.  It's your drug issue, that's what caused your problem.

You have a right to appeal my sentence.  If you want to appeal, you need to do so within 14 days.  If you don't appeal within 14 days, you risk losing the right to raise issues that otherwise could be raised.

Do you understand your right to appeal?  Is that yes?

THE DEFENDANT:  Yeah.

THE COURT:  Now, 176 months is a --

74

1          THE DEFENDANT:  Too much time.

2          THE COURT:  Well, let me go back and remind you of

3     something.  Our Congress that has created our country, that

4     creates our laws, they would have authorized a sentence of 20

5     years on the first offense, 20 years on the second offense,

6     ten years on the third offense all to run consecutively.  So a

7     legal sentence could have been as much as 50 years.  The

8     guideline, the U.S. Sentencing Commission suggests a guideline

9     beyond that which you received.

10          It's time for you to look inside and realize that

11     perhaps it's not the system making the mistake but perhaps

12     it's your decisions that are leading you where you are.

13          Anything further on behalf of the government?

14          MS. STOCKARD:  No, Your Honor.

15          THE COURT:  Anything further on behalf the

16     defendant?

17          MR. HUFFMAN:  No, Your Honor.

18          THE COURT:  We'll be in recess.

19          (Court stands in recess at 11:20 a.m.)

20

21

22

23

24

25

Case 6:18-cr-03084-MDH   Document 43   Filed 06/19/19   Page 75 of 76

CERTIFICATE OF OFFICIAL REPORTER

     I, Jeannine M. Rankin, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, Southern Division, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings.




                              */s/ Jeannine M. Rankin*

Date:      06/19/9      Jeannine M. Rankin, CCR, CSR, RPR

Case 6:18-cr-03084-MDH   Document 43   Filed 06/19/19   Page 76 of 76